**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DAAVEED CHARLEAU, on behalf of
himself and all others similarly situated,

        Plaintiff,

        v.

S-L DISTRIBUTION COMPANY, LLC,

        Defendant.

Civil Action No.: 1:20-cv-00879-JEJ

Hon. John E. Jones, III, Chief Judge

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT S-L DISTRIBUTION COMPANY, LLC'S
<u>MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 3

LEGAL STANDARD ...................................................................................... 6

ARGUMENT ................................................................................................. 7

    I.    Courts Narrowly Construe The MWA ................................................ 7

    II.   The Profits Charleau Distribution Receives From Its Sales
           Under The Distributor Agreement Are Not "Wages" Within
           The Meaning Of The MWA ............................................................... 8

           A.    Compensation Only Constitutes "Wages" If It Is Payment
                 For "Labor And Services." ...................................................... 8

           B.    Charleau Distribution's Profits Are Not Payments For
                 "Labor And Services." .......................................................... 10

    III.  Profits Charleau Distribution Receives From Its Sales Under
           The Distributor Agreement Are Also Not MWA-Covered
           "Commissions." ................................................................................ 14

           A.    The MWA Only Covers "Commissions" That Are
                 "Definitely Determined" And "Due And Payable." ................ 14

           B.    Charleau Distribution's Profits Are Not "Definitely
                 Determined" And "Due And Payable." .................................. 15

           C.    Even If Charleau Distribution's Profits Could Constitute
                 "Wages" Or "Commissions" Under the MWA, The
                 Distributor Agreement Belies Any Assertion That S-L
                 Compensated Him ................................................................ 19

CONCLUSION .............................................................................................. 21

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................6

*Baptista v. Abbey Health Care Grp., Inc.*,
  1996 WL 33340740 (D. Mass. Apr. 10, 1996).................................19

*Birnbach v. Atenna Software, Inc.*,
  2014 WL 2945869 (D. Ma. June 26, 2014)................................15, 16

*Brown v. Martin*,
  2020 WL 419637 (M.D. Pa. Jan. 27, 2020)........................................6

*Cumpata v. Blue Cross Blue Shield of Mass., Inc.*,
  113 F. Supp. 2d 164 (D. Mass. Sept. 13, 2000).................................19

*Dennis v. Jager, Smith & Stetler, P.C.*,
  2000 WL 782946 (Mass. Super. Apr. 10, 2000) .........................17, 19

*DeSaint v. Delta Air Lines, Inc.*,
  2015 WL 1888242 (D. Mass. Apr. 15, 2015)................................9, 10

*Doucut v. IDS Scheer, Inc.*,
  734 F. Supp. 2d 172 (D. Mass. 2010)......................................8, 9, 21

*Dwyer v. Blue Sea Prods, LLC*,
  2020 WL 1441616 (D.N.J. Mar. 23, 2020) ..................................7, 18

*Fitzgerald v. Chiprights Design, Inc.*,
  2005 WL 1869151 (Mass. Super. July 1, 2005)...........................8, 16

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ....................................................6

*Gabovitch v. First Signs Inc.*,
  2008 WL 2038244 .................................................................17

*Hanna v. S-L Distribution Co., LLC*,
  Case No. 1:19-cv-02143-JEJ ....................................................3

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Knous v. Broadridge Fin. Sols., Inc.*,
  2020 WL 2747821 (D. Mass. May 27, 2020) .......................................................9

*Maranzano v. S-L Distribution Co., LLC*,
  Case No. 1:19-cv-01997-JEJ ...............................................................................2

*Marston v. S-L Distribution Co., LLC*,
  Case No. 1:19-cv-02187-JEJ ...............................................................................2

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2014) ................................................................................3

*McTernan v. City of York, PA*,
  577 F.3d 521 (3d Cir. 2009) ................................................................................6

*Melia v. Zenhire, Inc.*,
  967 N.E.2d 580 (Mass. 2012) ........................................................................8, 19

*Mercedes-Benz Fin. Servs. USA LLC v. Synergistiks, Inc.*,
  2019 WL 571894 (W.D. Pa. Feb. 12, 2019) ...........................................6, 14, 20

*Mode v. S-L Distribution Co., LLC*,
  2019 WL 1057045 (W.D.N.C. Mar. 6, 2019) ............................................*passim*

*Patel v. 7-Eleven, Inc.*,
  2020 WL 3303003 (N.D. Ill. June 18, 2020) ............................................2, 12, 13

*Roma v. Ratio*,
  2015 WL 1523098 (D. Mass. Mar. 31, 2015) ...................................................18

*Sterling Research, Inc., v. Pietrobono*,
  2005 WL 3116758 (D. Mass. Nov. 21, 2005) ..............................................7, 10

*Troche v. Bimbo Foods Bakeries Distribution, Inc.*,
  2015 WL 4920280 (W.D.N.C. Aug. 18, 2015) ...........................................11, 18

*Vrabac v. S-L Distribution Co., LLC*,
  Case No. 1:20-cv-00937-JEJ ...............................................................................3

*Weems v. Citigroup Inc.*,
  900 N.E.2d 89 (Mass. 2009) ............................................................................7, 9

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Weiss v. DHL Express, Inc.*,
  718 F.3d 39 (1st. Cir. 2013)....................................................................16

**Statutes**

Massachusetts Equal Pay Act .....................................................................7

Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148...........................*passim*

N.C. Gen. Stat. § 95-25.2...........................................................................18

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .....................................................9

Federal Rule of Civil Procedure 12(b)(6) ................................................3, 6

## INTRODUCTION

Plaintiff Daaveed Charleau owns and operates a snack sales/distribution business called Charleau Distribution, LLC ("Charleau Distribution") that entered into a commercial Distributor Agreement ("Agreement") with Defendant S-L Distribution Company, LLC ("S-L"). The Agreement creates an arm's-length independent contractor relationship. Plaintiff has freely operated his business for years, generating millions of dollars in sales, managing his business expenses, determining his own schedule, and having the freedom to hire his own workers as he deemed appropriate.

But now, disavowing the Agreement that forms the basis of his relationship with S-L, Plaintiff alleges that he is an employee of S-L. On behalf of a putative class, he claims that S-L violated the Massachusetts Wage Act ("MWA"), Mass. Gen. Laws ch. 149, § 148, which applies exclusively to employees, by failing to pay him "wages" or "commissions," as first alleged in the Amended Complaint (Dkt. 31).

Despite Plaintiff reworking his allegations in a futile attempt to duck S-L's original Motion to Dismiss (Dkt. 26), the Amended Complaint does not change the fact that the monies Charleau Distribution generated were profits from sales under a commercial contract, not "wages" or "commissions" within the meaning of the MWA, regardless of the conclusory label Plaintiff uses. The U.S. District Court for

the Western District of North Carolina properly reached a similar conclusion in interpreting a virtually identical Distributor Agreement under a state-law definition of "wages" that includes "commissions" and is *broader* than the MWA. *See Mode v. S-L Distribution Co., LLC*, 2019 WL 1057045, at *3-5 (W.D.N.C. Mar. 6, 2019), attached as Ex. 2. And in another employee misclassification case brought by Plaintiff's counsel, the U.S. District Court for the Northern District of Illinois similarly held that profits franchisees derive from a franchise agreement are not "wages" under an equally broad definition of "wages" under Illinois state law. *See Patel v. 7-Eleven, Inc.*, 2020 WL 3303003 (N.D. Ill. June 18, 2020), attached as Ex. 3.

Because Plaintiff, like the plaintiff in *Mode*, makes money by purchasing goods from S-L through a corporate entity and reselling those goods at higher prices to retail customers, whatever profits Plaintiff receives from Charleau Distribution are not "wages" or "commissions" within the meaning of the MWA. Thus, Plaintiff still has not plausibly alleged that the monies generated by his business are covered by the MWA, and the sole count in Plaintiff's Amended Complaint fails as a matter of law. The Court should dismiss this action, with prejudice, in its entirety.[1]

---

[1] Plaintiff filed this action in the U.S. District Court for the District of Massachusetts, but the parties jointly moved to have the case transferred to this Court in light of the forum-selection clause in the Distributor Agreement and because the case is related to other matters pending in this Court (*Maranzano v. S-L Distribution Co., LLC*, Case No. 1:19-cv-01997-JEJ; *Marston v. S-L Distribution Co., LLC*, Case No. 1:19-

## BACKGROUND

Plaintiff is the owner of Charleau Distribution, a Massachusetts limited liability company that entered into a Distributor Agreement with S-L. *See* Distributor Agreement.[2] The Agreement provides Charleau Distribution the right to purchase and sell to retail customers certain S-L and other products within a defined geographic territory. *Id.* at Art. 4. Charleau Distribution, in turn, is responsible for ordering, selling, distributing, and merchandising S-L and other products to its retail customers. *Id.* at Art. 5.A. It can achieve these results in the manner that it chooses and can retain its own workers at its discretion, without the need for S-L's approval. *Id.* at Art. 2.B-D.

The Agreement is clear that Charleau Distribution makes a profit (or suffers a loss) by purchasing products from S-L or other sellers for one price and then selling those products to third-party retailers for a higher price—pocketing the difference (less costs and charges it agreed to bear such as for loan payments or promotions).

---

cv-02187-JEJ; *Hanna v. S-L Distribution Co., LLC*, Case No. 1:19-cv-02143-JEJ; and *Vrabac v. S-L Distribution Co., LLC*, Case No. 1:20-cv-00937-JEJ).

[2] An authentic copy of the Distributor Agreement is attached hereto as Exhibit 1. Although Plaintiff did not attach the Distributor Agreement to the Complaint or the Amended Complaint, the Court may consider it because the Amended Complaint relies on it, and it is central to Plaintiff's claim. Dkt. 31 ("Am. Compl.") ¶ 8; *see, e.g.*, *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2014) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint . . . , as well as undisputedly authentic documents if the complainant's claims are based upon these documents.").

*See id.* at Art. 10; *see also* Am. Compl. ¶ 31. This profit model carries inherent risk, as Charleau Distribution (like a typical independent business) must bear its own expenses—including for providing and maintaining its own equipment (e.g., vehicles and insurance); hiring and compensating any employees or other helpers, *id.* at Art. 5; and purchasing product it is ultimately "unable to sell" or that becomes "damaged" or "stale" subsequent to purchase from S-L, *id.* at Art. 9. The Agreement provides that S-L decides the prices Charleau Distribution must pay for S-L's goods. *See id.* at Art. 1.B ("From time to time, an Authorized Product . . . may have its price changed on the Price List."); *id.* at Art. 10.A. But "whether [Charleau Distribution] realizes *profits* or suffers losses shall exclusively result from the efforts and skills of [Charleau Distribution]." *Id.* at Art. 2.C (emphasis added); *see id.* at Art. 25.A ("Distributor agrees, understands and acknowledges that there are significant risks in any business venture and that the primary factor in Distributor's success or failure will be Distributor's and its directors, officers and employee's own efforts and skill."). In fact, Charleau Distribution "acknowledges and agrees" that S-L has made "no representation, warranty or guaranty regarding the sales volume or profit which [Charleau Distribution] may derive from th[e] Agreement." *Id.* at Art. 25.A.

Some of Charleau Distribution's retail customers choose to pay it directly for the goods they purchase. *Id.* at Art. 5.D; *see* Am. Compl. ¶ 22. For others, S-L permits "central billing," whereby (for administrative ease) Charleau Distribution's

customers may remit payment to S-L for Charleau Distribution's sales to them, and then S-L passes on those payments to Charleau Distribution on a weekly basis (less agreed-upon adjustments for "purchase costs for the Products, leasing costs, charges, credits" and other authorized charges). *Id.* at Art. 10.A-B; *see* Am. Compl. ¶ 31.

Beyond requiring Charleau Distribution to comply with all applicable laws (Distributor Agreement at Art. 5.F), the Agreement does not dictate how, what, or when Charleau Distribution pays Plaintiff. To the contrary, the Agreement provides that Charleau Distribution shall: (1) "obtain and acquire, on its own and at its own cost, all of the skills, instructions, employees, resources, equipment, materials and training that is needed to perform its obligations and services hereunder," *id.* at Art. 2.D; (2) "bear all costs and expenses associated with the employment or retention of such persons, including, but not limited to, wages, overtime, salaries, employment taxes, worker's compensation coverage, healthcare, retirement benefits, and insurance coverage," *id.* at Art. 5.E; and (3) "be solely responsible for complying with all wage, overtime, benefit and other employment laws for . . . its employees," *id.* at Art. 5.F. To that end, Charleau Distribution further agreed that "neither it nor its employees will receive from S-L any benefits of the type typically provided to an employee, including, without limitation, wages[.]" *Id.* at Art. 25.B.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim cannot be facially plausible unless "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* But the Court need not credit "conclusory" or barebones allegations. *Id.* at 678-79; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Similarly, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *McTernan v. City of York, PA*, 577 F.3d 521, 531 (3d Cir. 2009) (citation omitted). And the Court may not accept factual allegations that are contradicted by a document referred to in and integral to the Complaint—here, the Distributor Agreement. *E.g.*, *Brown v. Martin*, 2020 WL 419637, at *2 (M.D. Pa. Jan. 27, 2020); *Mercedes-Benz Fin. Servs. USA LLC v. Synergistiks, Inc.*, 2019 WL 571894, at *2 (W.D. Pa. Feb. 12, 2019) ("The court may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiffs' allegations in a complaint.") (citation omitted).

## ARGUMENT

To state a claim under the MWA (Mass. Gen. Laws ch. 149, § 148),[3] a plaintiff must sufficiently allege that (1) he was an employee under the MWA; (2) the alleged "compensation" at issue constitutes "wages" *or* "commissions" under the MWA; and (3) the defendant violated the MWA by not paying his wages or commissions in a timely manner. *See, e.g.*, *Dwyer v. Blue Sea Prods, LLC*, 2020 WL 1441616, at *3-4 (D.N.J. Mar. 23, 2020). Here, even if Plaintiff were S-L's employee, which he is not, Plaintiff's claims fail because he has not sufficiently alleged the second element: that the profits his business generates under the Distributor Agreement are "wages" or "commissions" under the MWA.

## I.     Courts Narrowly Construe The MWA.

Courts interpreting the MWA have explained that it "is construed narrowly." *Sterling Research, Inc., v. Pietrobono*, 2005 WL 3116758, at *13 (D. Mass. Nov. 21, 2005) (citation omitted); *see Weems v. Citigroup Inc.*, 900 N.E.2d 89, 94 n.10 (Mass. 2009) (distinguishing the narrow purpose of "the weekly wage act" (i.e., the MWA) from broader remedial statutes such as the Massachusetts Equal Pay Act in which the term "wages" has been interpreted as encompassing all potential sources of pay). This interpretation is based on the intent, design, and purpose of the MWA,

---

[3] S-L reserves the right to enforce the Distributor Agreement's Pennsylvania choice-of-law clause if its motion is denied.

which is "to protect wage earners from the long-term detention of wages by unscrupulous employers as well as protect society from irresponsible employees who receive and spend lump sum wages." *Melia v. Zenhire, Inc.*, 967 N.E.2d 580, 587 (Mass. 2012) (citation omitted); *see Fitzgerald v. Chiprights Design, Inc.*, 2005 WL 1869151, at *2 (Mass. Super. July 1, 2005) ("The legislative purpose behind enactment of the [MWA] was to ensure that employees are paid their wages at regular intervals, promptly after they have been earned."). To that end, courts are not required to accept a plaintiff's conclusory use of the terms "wages" or "commissions." *See, e.g.*, *Doucut v. IDS Scheer, Inc.*, 734 F. Supp. 2d 172, 192 (D. Mass. 2010) ("Simply addressing the bonuses in terms of commissions does not make them commissions under the [MWA].").

## II.    The Profits Charleau Distribution Receives From Its Sales Under The Distributor Agreement Are Not "Wages" Within The Meaning Of The MWA.

### A.    Compensation Only Constitutes "Wages" If It Is Payment For "Labor And Services."

The MWA applies to "wages." Mass. Gen. Laws ch. 149, § 148. The MWA does not define "wages," other than to state it "shall include any holiday or vacation payments due an employee under an oral or written agreement." *Id.* Given the absence of further definition, courts have held that the term "wages" should be given

"its ordinary meaning," consistent with common dictionary definitions.[4] *DeSaint v. Delta Air Lines, Inc.*, 2015 WL 1888242, at *9 (D. Mass. Apr. 15, 2015) (applying Black's Law Dictionary's definition of the term); *see also Knous v. Broadridge Fin. Sols., Inc.*, 2020 WL 2747821, at *2 (D. Mass. May 27, 2020) ("If the statute does not define a term, the court 'can look to the dictionary for clarification of the plain meaning of the words selected by [the legislature].'") (citation omitted; alteration in *Knous*). Black's Law Dictionary defines "wage" as "[p]ayment for labor or services, usually based on time worked or quantity produced." Black's Law Dictionary (11th ed. 2019); *see also* wage, Merriam-Webster.com ("a payment usually of money for labor or services usually according to contract and on an hourly, daily, or piecework basis").

That definition aligns with the MWA's purpose and is materially the same as the one applied in *Mode* (*see infra* pp. 11-14) because (1) the Massachusetts Supreme Judicial Court has explicitly rejected arguments that "wages" has a "broad definition," *Weems*, 900 N.E.2d at 94 n.10; and (2) courts interpreting the MWA

---

[4] In *Doucut*, the court stated that "according to the Massachusetts Appeals Court, '[t]here is . . . no need to resort to the popular meaning of the term "wages," to *Black's Law Dictionary,* or to other statutes using the term "wage."'"). 734 F. Supp. 2d at 192-93 (quoting *Prozinski v. Ne. Real Estate Servs., LLC*, 797 N.E.2d 415, 420 (Mass. App. Ct. 2003)). The court made that statement, however, in the context of explaining that the MWA should be narrowly interpreted and, thus, does not include all types of compensation (such as bonuses or severance pay) that may be included in other definitions of "wages." *See id.*

have explained that "***'[n]ot everything that is earned is a wage'***" within the meaning of the MWA, *Sterling Research, Inc.,* 2005 WL 3116758, at *13 (citation omitted; emphasis added). Thus, Charleau Distribution's profits are not "wages" under the MWA *unless* they are "payment for labor or services." *See DeSaint*, 2015 WL 1888242, at *9; *see also Mode*, 2019 WL 1057045, at *3-5 (holding that profits an S-L distributor makes are not wages because they are not payments for "labor and services" rendered).

### B. Charleau Distribution's Profits Are Not Payments For "Labor And Services."

Ignoring the Distribution Agreement, Plaintiff, in one sentence, concludes that "S-L pay[s] Plaintiff and other IBOs compensation for their distribution labor and services each week." Am. Compl. ¶ 23.[5] Plaintiff cannot plausibly dispute, however, that Charleau Distribution earns money by purchasing goods from S-L and others, and reselling those goods to third-party retailers at higher prices. Distributor Agreement at Art. 10. That profit-by-resale model takes Charleau Distribution's earnings outside the MWA's coverage of "wages," regardless of what Plaintiff chooses to call them.

---

[5] A person who operates a valid business entity that entered into a Distributor Agreement with S-L is commonly referred to as an "independent business operator" or an "IBO."

In *Mode*, the U.S. District Court for the Western District of North Carolina evaluated the same profit arrangement under a virtually identical S-L Distribution Agreement, and held as a matter of law (on a motion to dismiss) that these profits are *not* "wages" under North Carolina's wage law. *See* 2019 WL 1057045, at *4 ("S-L did not compensate Plaintiffs for their 'labor and services,' and therefore, their income does not constitute 'wages' under the NCWHA."). That decision followed the same conclusion (and "the [c]ourt's precedent") in connection with a substantially similar distributor agreement, demonstrating it is no outlier. *Id.* at *3; *see Troche v. Bimbo Foods Bakeries Distribution, Inc.*, 2015 WL 4920280, at *7 (W.D.N.C. Aug. 18, 2015) (holding similar profit-based arrangement of resale earnings is not "wages" because it was not "for labor or services rendered"), attached as Ex. 4.

The *Mode* court reached its decision based on three essential and undisputable facts. First, the *Mode* plaintiffs' "compensation was solely based on the volume of goods they purchased from S-L and then resold to third parties at a higher price"— not "labor and services." 2019 WL 1057045, at *4. Second, the *Mode* plaintiffs "were not parties to the Distributor Agreements in their individual capacity, and under the Distributor Agreements, S-L made payments to the corporate distribution entities, not to [p]laintiffs directly." *Id.* Third, "the Distributor Agreements expressly provide that 'neither [Distributor] nor its employees will receive from S-L any

11

benefits of the type typically provided to an employee, including . . . wages[.]'" *Id.* (first alteration in original). The Court is presented with the same facts here.

Charleau Distribution earns income by selling goods to its customers while, at the same time, bearing the cost of the goods sold and other business expenses that offset its revenue. In other words, what Charleau Distribution ultimately receives under the Distribution Agreement is the profit from each of its sales. *See id.* at *3 ("[W]hen a plaintiff purchases goods from a defendant and earns income by selling those goods to third-party retailers at a higher price, the profits earned on that sale fall outside of the NCWHA's definition of 'wages.'" (citing *Troche*, 2015 WL 4920280, at *7)). In cases where Charleau Distribution's retail customers send their payments to S-L for administrative ease, S-L remits those payments to Charleau Distribution. But that administrative step does not alter the substance of (1) what Charleau Distribution receives (i.e., the profits from sales); or (2) what the payment to Charleau Distribution is for: the sales price less the purchase price (and other agreed-to offsets)—not "labor or services." *See* Distributor Agreement at Art. 10.A; *see also id.* at Arts. 4-5. This is consistent with the *Patel* decision where the court rejected Plaintiff's counsel's argument that a form of profit sharing constituted "wages" under Illinois law, noting that, like here, the profits depended entirely "on customer sales." 2020 WL 3303003, at *3 ("If no one made a purchase at the store

12

there would be no profit to split, and consequently, no obligation for 7-Eleven to remit payment to Patel.").

Second, the Distributor Agreement—which is between S-L and Charleau Distribution—makes clear that the payments to Charleau Distribution (a business entity) are beyond the common or ordinary meaning of "wages." For example, the Agreement states that "S-L shall have *no responsibility* to . . . pay[] *wages*" to Charleau Distribution or anyone it hires. Distributor Agreement at Art. 10.A (emphasis added); *see id.* at Art. 25.B. Thus, Plaintiff has already agreed that S-L does not pay wages to Charleau Distribution, him, or anyone else working on behalf of Charleau Distribution. *See supra* pp. 3-5. And as discussed above, the mechanics of the payments under the Agreement make clear that they do not resemble anything commonly understood to be "wages." *Id.*

Third, the Agreement further provides that "[t]he manner, means and methods" by which Charleau Distribution obtains "results" under the Agreement "shall be determined solely by [Charleau Distribution's] independent discretion and judgment." Distributor Agreement at Art. 2.B. To that end, Charleau Distribution is "solely responsible for selecting, providing and maintaining, at its expense, all personnel . . . as may be needed for the efficient and proper distribution and sale of the Productions and the operation of the Territory," *id.* at Art. 5.B; and "may employ or retain such persons as it deems necessary to perform this Agreement and service

13

the Territory," *id.* at Art. 5.E. *See id.* at Art. 2.D. These provisions confirm that Plaintiff is under no obligation to do any work himself under the Agreement, so the payments his business receives could not be for *his* labor or services.

In sum, by definition, the profit Charleau Distribution earns from the purchase and resale of S-L products cannot be payment for Plaintiff's "labor or services" because the Distributor Agreement gives Charleau Distribution the absolute right to determine who performs that labor and how much Charleau Distribution will pay for it. Thus, despite the conclusory allegation that "S-L pay[s] Plaintiff and other IBOs compensation for their distribution labor and services each week" (Am. Compl. ¶ 23), Plaintiff has failed to sufficiently allege facts supporting the payment of MWA "wages." *See Mercedes-Benz Fin. Servs. USA LLC*, 2019 WL 571894, at *2; *Mode*, 2019 WL 1057045, at *3-5.

## III. Profits Charleau Distribution Receives From Its Sales Under The Distributor Agreement Are Also Not MWA-Covered "Commissions."

### A. The MWA Only Covers "Commissions" That Are "Definitely Determined" And "Due And Payable."

In its original Motion to Dismiss (Dkt. 26), S-L explained why Plaintiff had failed to plausibly allege that Charleau Distribution's profits are "wages" under the MWA. Rather than pleading facts to the contrary in his Amended Complaint, Plaintiff still refers to the profits as "wages" (Am. Compl. ¶ 33) but now also labels them "commissions"—presumably, an alternative effort to shoehorn them into the

MWA. *See* Am. Compl. ¶¶ 25 ("IBOs are paid a commission on the sale of each of Defendant's products."), 26. Plaintiff's new "commissions" label—which the Court need not accept—is a red-herring. The MWA only provides that it "shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee," Mass. Gen. Laws ch. 149, § 148. Thus, to state a claim based on non-payment of MWA-covered "commissions," Plaintiff must plead facts establishing that the payments are (1) "due and payable"; (2) "definitely determined"; and (3) "earned" by virtue of the work or service actually performed. *Birnbach v. Atenna Software, Inc.*, 2014 WL 2945869, at *4 (D. Ma. June 26, 2014) (granting motion to dismiss because, *inter alia*, plaintiff's allegedly owed "commissions" were not "earned"). Plaintiff's half-hearted attempt falls short.

### B. Charleau Distribution's Profits Are Not "Definitely Determined" And "Due And Payable."

Charleau Distribution's profits are based on a multitude of factors and contingencies, including *at least* the following:

1. The price Charleau Distribution pays S-L for a product, which may vary (Distributor Agreement at Arts. 1.B, 4.A, 10.A);

2. What products Charleau Distribution sells to its retail customers (*id.* at Arts. 1.B-C, 4.C, 5.C);

3. The volume of products Charleau Distribution buys from S-L (*id.* at Arts. 2.B-D, 4.C, 5.C-D, 7.A, 25.A);

4. How often Charleau Distribution purchases products from S-L (*id.*);

5. The volume of products Charleau Distribution sells to its retail customers (*id.*);

6. How often Charleau Distribution sells products to its retail customers (*id.*);

7. The price at which Charleau Distribution sells products to its retail customers (*id.* at Art. 4.B);

8. The number of retail customers to which Charleau Distribution sells products (*id.* at Art. 8);

9. The volume of products that Charleau Distribution purchases but cannot sell or return to S-L because they are distressed, stale, out-of-code, or damaged (*id.* at Art. 9.B);

10. Varying weekly promotions on different products sold (*id.* at Arts. 1.B.-D., 4.C); and

11. Charleau Distribution's expenses in running its operations, including payments to Plaintiff and any other workers it hires to perform under the Distributor Agreement, truck expenses, fuel expenses, loan interest, and more (*id.* at Arts. 1.B-C, 2.B-D, 5).

In light of these contingencies, Charleau Distribution's profits are not "commissions" under the MWA. They are instead, at best, among the kinds of payments that fall outside the MWA's coverage, such as discretionary bonuses, severance, and other contingency-related payments, because they are not "wage equivalents." *Fitzgerald*, 2005 WL 1869151, at *2 (explaining that "the Court has interpreted the statute narrowly, limiting its application to the payment of ordinary wages and wage equivalents") (citations omitted); *see, e.g.*, *Weiss v. DHL Express, Inc.*, 718 F.3d 39, 42 (1st. Cir. 2013) (discretionary bonus is not a wage); *Birnbach*, 2014 WL 2945869, at *3 ("unpaid severance is not cognizable under the [MWA]");

*Gabovitch v. First Signs Inc.*, 2008 WL 2038244, at *3 (Mass. Ct. App. May 14, 2008 (unpublished) (compensation owed pursuant to an agreement—and that was based on "irregular and contingent . . . funding" of a nonprofit organization—was outside "the protections of the [MWA]"); *Dennis v. Jager, Smith & Stetler, P.C.*, 2000 WL 782946, at *1-2 (Mass. Super. Apr. 10, 2000) (an attorney's "substantial and irregular compensation, in the form of a draw" "falls outside [the MWA's] scope and purpose").

Plaintiff's new allegation that "Plaintiff and other IBOs are paid a set percentage in an amount equal to the difference between the amount of money that the Outlets pay S-L for products and the amount of money that S-L purports to 'charge' IBOs for S-L's products" is of no moment. Am. Comp. ¶ 25 (emphasis omitted). The Distributor Agreement does not provide for any specific percentage of sales for which S-L would pay Charleau Distribution, which is plain from the face of the Distributor Agreement. *See, e.g.*, Distributor Agreement at Art. 10. Nor is any payment to Charleau Distribution tied to work that Plaintiff may have performed himself. The Distributor Agreement makes clear that any revenue Charleau Distribution generates under the Agreement could be through the work of any number of employees or helpers—even if Plaintiff himself does *nothing*. *See, e.g.*, *id.* at Art. 2.B-C.

17

This case is no different than *Dwyer v. Blue Sea Products, LLC*, in which the court denied the plaintiff's motion to reconsider dismissal of his MWA claim because, among other things, the alleged "commission" was "not a percentage of the revenue attributable to [p]laintiff's individual efforts." 2020 WL 1441616, at *3-4. Indeed, even if Plaintiff is the sole owner, employee, or shareholder of Charleau Distribution, as in *Dwyer*, the "plain language" of the Distributor Agreement demonstrates that Charleau Distribution's profits "w[ere] not pegged to the revenue that *Plaintiff himself* generated each year," taking it outside the MWA's coverage. *See id.* at *4 (emphasis added).

Additionally, given the identical pertinent facts underlying the profits here and those in *Mode* and *Troche*, S-L's contention that the MWA does not cover Charleau Distribution's profits is even stronger than the successful arguments in *Mode* and *Troche* under North Carolina law. North Carolina's definition of "wages"—i.e., "compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, ***commission, or other basis of calculation***," N.C. Gen. Stat. § 95-25.2 (emphasis added)—is broader than the forms of compensation covered by the MWA, which does not include any catch-all "other basis" language. *See* Mass. Gen. Laws ch. 149, § 148. And cases interpreting the MWA—and holding that the MWA does not cover *any* payments tied to "profits" or "triggered by contingencies"—confirm it. *E.g.*, *Roma v. Ratio*, 2015 WL 1523098,

18

at *8 (D. Mass. Mar. 31, 2015) (holding that entitlement to "percentage of profits" did not "qualify as commissions under the Wage Act"); *Dennis*, 2000 WL 782946, at *1; *see Baptista v. Abbey Health Care Grp., Inc.*, 1996 WL 33340740, at *4 (D. Mass. Apr. 10, 1996) ("The distinction between assured and contingent compensation is a sound one.").

At bottom, just as the profits in *Mode* did not constitute "wages" under North Carolina's statute, Plaintiff's attempt to label Charleau Distributions profits as "commissions" does not bring them within the confines of who or what the MWA is meant to protect. *See Melia*, 967 N.E.2d at 587; *Cumpata v. Blue Cross Blue Shield of Mass., Inc.*, 113 F. Supp. 2d 164, 168 (D. Mass. Sept. 13, 2000) (concluding that, "irregular and substantial compensation," like the commission sought by plaintiff, was not afforded the protection of the MWA); *Dennis*, 2000 WL 782946, at *1 (explaining that "the only impression that can possibly be derived from [the MWA], is that its intent is to protect *laborers and casual wage earners* who might otherwise be vulnerable to employer intimidation") (citation omitted; emphasis added). Plaintiff's MWA claim fails.

**C. Even If Charleau Distribution's Profits Could Constitute "Wages" Or "Commissions" Under the MWA, The Distributor Agreement Belies Any Assertion That S-L Compensated Him.**

Plaintiff repeats a mantra that "S-L" or "Defendant" pays him:

1. "Defendant pays Plaintiff . . . to deliver/distribute Snyder's-Lance food products to retail stores and other outlets," Am. Compl. ¶ 14;

19

2. "S-L pays Plaintiff and other IBOs compensation for their distribution labor and services each week via direct deposit checks," *id.* ¶ 23;

3. "Plaintiff and other IBOs are paid a set percentage in an amount equal to the difference between the amount of money that the Outlets pay S-L for products and the amount of money that S-L purports to 'charge' IBOs for S-L's products," *id.* ¶ 25; and

4. "Defendant deducts approximately $477 from his wages each week," *id.* ¶ 33.

But the plain and undisputed language of the Distributor Agreement belies those allegations. The Distributor Agreement, (1) is between the ***distribution entity*** (Charleau Distribution) ***and S-L*** (*see* Distributor Agreement at pp. 1, 26); and as set forth above, (2) only provides for the exchange of monies between Charleau Distribution and its customers, or S-L and Charleau Distribution—***not Plaintiff***. *See id.* at Arts. 5.E, 10, 25.B.

Because the Distributor Agreement makes clear that S-L did not—and had no obligation or even authority to—pay any sums of money to Plaintiff individually (in contrast to his business), the Court need not credit Plaintiff's allegations about his purported pay from S-L. *See, e.g.*, *Mercedes-Benz Fin. Servs. USA LLC*, 2019 WL 571894, at *2. And it is telling that Plaintiff sets forth no plausible allegations regarding his actual pay, such as how, when, or what Charleau Distribution pays him from its profits, which is a matter that necessarily does not involve S-L. Without plausible allegations addressing those points, Plaintiff cannot meet his burden to

allege that he received MWA-covered compensation of any kind arising out of the Distributor Agreement and, therefore, that S-L could have violated the MWA. Plaintiff has failed to state a viable claim for this additional, independent reason. *See, e.g.*, *Doucut*, 734 F. Supp. 2d at 192-94.

## CONCLUSION

Because Plaintiff has not sufficiently alleged that Charleau Distribution's profits are "wages" or "commissions" under the MWA, any reduction in the course of calculating those profits—whether through an offset labeled by Plaintiff as a "deduction" or an alleged failure to reimburse an expense that Charleau Distribution contractually agreed to bear in exchange for the opportunity to make millions of dollars of sales—cannot be an unlawful withholding of an MWA-covered form of compensation. S-L respectfully requests that the Court dismiss Plaintiff's Amended Complaint, with prejudice, in its entirety.

Dated: December 17, 2020

Respectfully submitted,

*/s/ Michael J. Puma*

Michael J. Puma (*pro hac vice*) (PA 94453)
Benjamin Jacobs (*pro hac vice*) (PA 315984)
Emily Reineberg (PA 324183)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street , 6th Floor
Philadelphia, PA 19103
T. 215.963.5000 / F. 215.963.5001

michael.puma@morganlewis.com
benjamin.jacobs@morganlewis.com
emily.reineberg@morganlewis.com

James P. Looby (*pro hac vice*) (IL
6306467)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, 5th Floor
Chicago, IL 60601
T. 312.324.1000 / F. 312.324.1001
james.looby@morganlewis.com

*Attorneys for Defendant S-L Distribution
Company, LLC*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2020, a copy of the foregoing was filed electronically and served upon all counsel of record via operation of the Court's CM/ECF System or by mail upon anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael J. Puma*
Michael J. Puma